UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER,
by and through IAN MILLER, personal
representative of the Estate,
     Plaintiff,

       v.

SEAN ROYCROFT and SPENCER
JACKSON, in their individual capacities
and the TOWN OF BARNSTABLE,
MASSACHUSETTS,
     Defendants

Case No. 1:21-cv-10738-AK

---

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS**

---

## I.  STATEMENT OF FACTS

The defendants incorporate herein their Statement of Material Facts in Support of Motion

for Summary by Defendants ("DSOF"), filed herewith.  In addition, the defendants state that the

raw facts of this matter are largely undisputed. On April 16, 2019, at 7:03:56 P.M., Miller's

longtime girlfriend, Amy Anderson, placed a 911 call that routed to Barnstable Police

Department ("BPD"). (DSOF ¶5; Ex. 2, BPD Dispatch Log; Ex. 7, Affidavit of Amy Anderson,

at ¶1). Anderson informed dispatch "Um, we need the police, there's someone very delusional

here—my husband." (Ex. 19 at 00:00:16). "…[H]e needs a psych evaluation, but, ah, it's very

frightening." (DSOF ¶5; Ex. 19 at 00:00:23). Anderson gave her first name and then

disconnected the call. (Ex. 19 at 00:00:36). Anderson had recently returned home from a trip to

find Miller appearing to be "fully experiencing another psychotic episode" similar to one he had had in 2017, when he was charged with assault and battery of two psychiatric hospital security guards. (Ex. 7 at ¶2-10, 19). Miller had been "very intense and combative," speaking with people who were not there, and his imaginary conversations would "escalate significantly and then…subside" in "drastic swings." (Ex. 8, Deposition Transcript of Amy Anderson at 22-23). Miller's behavior was "erratic" and he appeared to have been engaging in "physical combat" with imaginary individuals who he felt had wronged him in business deals. (Ex. 8 at 22-23). Miller had caused an interior door to come off its hinges, had smeared jelly on the kitchen floor (calling it "royal jelly"), and appeared to be "very driven by a higher purpose, a spiritual purpose to awaken humanity." (DSOF; Ex. 8 at 10). Anderson had become increasingly frightened since returning home, and was fearful for her safety, as well as Miller's. (DSOF ¶22; Ex. 7 24-39). She was also concerned Miller might become adversarial with police. (DSOF ¶22). Miller[1] began to interact with Anderson "in terms of allegories," telling her that she had been "pregnant for 200 years" and would soon give birth to baby dragons. (Ex. 8 at 22). Anderson tried to wait the situation out, hoping a neighbor would call the police and attempting, unsuccessfully, to use the emergency call feature on her iPhone. (Ex. 7 at ₱ 32-37). It was only after Miller said to her, "You are going to have to be eliminated," that Anderson finally worked up the courage to call 911. (Ex. 7, 22, 28, 38). After providing dispatch with the few aforementioned details, she disconnected the call out of fear that Miller would be angry if she knew she had called the police. (Ex. 7 at ₱ 29-30; Ex. 19 at 00:00:37).

Knowing nothing about what was awaiting him at 45 Elm Street, Roycroft considered the mental health emergency and disconnected 911 call on his way to the scene.  He knew Jackson

---

[1]Referred to by Anderson as "Robert" in her affidavit and deposition testimony. (See Ex. 7, Affidavit of Amy Anderson; Ex. 8, Deposition Testimony of Amy Anderson).

had been dispatched and was also en route. (DFOS ¶14). When Roycroft approached the residence, Anderson was urgently whispering to him that Miller was "out back" and Roycroft could hear Miller yelling but could not make out what he was saying and did not know whether he was yelling at anyone, in particular.  (Id. at ¶19-29). Anderson appeared frantic and scared and was checking behind her as if concerned someone might approach from that direction.  (Id.). She told Roycroft Miller was delusional and had not been taking his medication or slept for days. (Id.). Roycroft asked her whether she thought it would be better for him to go through the house or around the side, made sure she felt safe standing at the front of the house while he went to check on Miller, and asked Anderson for her husband's first name so he could call him by it and try to establish a rapport with Miller. (Id.).

Miller seemed relatively calm at first and was able to engage in casual conversation with Roycroft, initially. (Id. at ¶41-46). Just after Roycroft told Miller his wife (Anderson) had called because she was concerned about him, however, things escalated and Miller's demeanor shifted dramatically—going from relatively calm, to furiously angry with clenched fists.  (DSOF ₱48-52). Roycroft followed Miller into the house and tried to stop Miller again by grabbing his arm. (DSOF ₱58-60). Miller yanked his arm away and began foraging for something on a small, dining room table in front of him.  (Id.). Scissor blades were later found on the table. (Ex. 6, p. 8).  Standing behind Miller, Roycroft put his arms around Miller's right shoulder and under Miller's left arm, and connected his hands at Miller's front.  (DSOF ₱66). In his incident report, he described this hold as a "seatbelt hold." (Id. at ¶67). A seatbelt hold is considered an "empty hand control hold." (Ex 20, Deposition of Scott DeFoe, at 71; Ex. 17).  Miller pulled away, struggling back to the table which he then used as leverage, pushing off of it to slam Roycroft against the back slider door so hard that a few seconds later, it fell out of its housing onto the

deck. The plaintiff's expert acknowledges this was "active resistance." (Ex. 18 at 73). Anderson could only partially see them struggling near the point of entry at the small table, and then saw Robert making progress across the floor further into the house, despite Roycroft's efforts to restrain him by holding onto him from behind with his arm across his front (Ex. 8, 53-54; DFOS ¶74, 78). Miller pinned Roycroft's left arm underneath his (Miller's) arm. (DFOS ¶77,87). Anderson describes all of this movement as "extremely quick," and "very, very quick," and estimates the totality of the encounter inside the house was "less than a minute" or "less than 90 seconds" total (Ex. 8, 52, 54; Ex. 7, ¶65). Miller managed to slowly drag Roycroft behind him and make forward progress toward Anderson and toward a bag of golf clubs and a single club on the floor. (DFOS ¶80, 86; Ex. 16). They fell down a single step with Roycroft landing to Miller's left, (id. at ¶90, 99), and his left arm pinned underneath Miller's body. (Id.). Plaintiff's expert agrees having an arm trapped underneath a subject would cause concern for one's safety. (Ex. 18 at 78-81).

It was around this time that Jackson arrived, and the totality of the officers' efforts were aimed at gaining control over Miller's concealed hands while he actively fought them off, kicking and twisting. (Id. ¶82-83, 96, 97, 100-111). Meanwhile, Miller was "winching" and "pinching" Roycroft's left arm further underneath him, which Roycroft recognized as an offensive tactic. (Id. ¶101-102). Jackson delivered two half-strength hand strikes to Miller's side that allowed them to gain control over Miller's hands, at which point they immediately applied and double-locked handcuffs to Miller's wrists. (Id. ¶114-125). The distraction strikes by Jackson were reasonable, (Ex. 18 at 83-84; Ex. 17), and it is undisputed that Miller was actively resisting arrest until the moment he was placed in handcuffs. (Ex. 7, 64). According to the only

witnesses to these events, no pressure was applied to Miller's head, torso or neck at any time. (Ex. 7, 58).

At some point—but she can't say when—Anderson recalls hearing Miller say "I can't breathe" and "Help me, Amy." (Ex. 7, ¶59-63). She does not know what position Miller or the officers were in at the time she heard these statements, but as soon as there was any question as to whether Miller was conscious or could breathe, both officers began CPR right away. (DFOS ¶126-131). Miller was pronounced dead at Cape Cod Hospital at 8:00 P.M. (DFOS ¶128, 142). His death certificate lists "cardiac dysrhythmia in the setting of" "excited delirium" due to "unknown psychiatric illness" "at the time of restraint" as his cause of death. (Ex. 1 at 1). The manner of Miller's death was deemed "natural." (Id.). Anderson does not recall what Jackson or Roycroft looked like, and has no memory of any actions either officer took throughout these events. (Id. ¶129, 144; Ex. 8, 36, 70).

### BPD Policies

Though there are guidelines as to *how many* officers should be dispatched to respond, there is no BPD policy or state regulation requiring officers responding to mental health emergencies to wait to respond or enter a scene until backup has arrived. (Ex. 3 at 1-7, 37-41). There is no BPD policy that requires an officer to interview a family member of a mentally ill individual prior to going to the mentally ill individual. (Ex. 3). On the contrary, BPD policy instructs officers responding to *any* call involving a mentally ill individual—let alone an emergency situation where the caller disconnects a 911 call—to first "quickly assess the situation and secure the scene." (Id. at 37-41). Similarly, there is no requirement that a takedown maneuver be used when trying to move a subject away from an area in order to prevent him from obtaining a weapon or check whether he has one in his hands. (Ex. 3). In accordance with BPD

policy pertaining to domestic violence and M.G.L. c. 209A, where an officer suspects abuse is likely to occur if he leaves the scene of a residence, the officer must "take immediate control of the situation and should separate the parties to prevent any violent action." (Ex. 3, p. 25). In accordance with M.G.L. c. 123 § 12, BPD policy pertaining to placing mentally ill individuals in emergency custody provides that, where an officer suspects that a mentally ill individual is likely to pose a danger to himself or others, the officer may detain that individual involuntarily. (Id. at 39). Where BPD trains officers on certain tactics and maneuvers, BPD's Response to Resistance policy explicitly states that "*No policy or procedure for deadly or less lethal force can cover every situation officers may encounter,*" and that "Officers are expected to respond to all situations decisively and use proper judgment, restraint and competence, whatever the level of force required. (Id. at 8)(emphasis added).

## II. STANDARDS OF REVIEW

Summary judgment is warranted where the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must construe the facts n the light most favorable to the plaintiff, with the qualification that "evidence from the moving party as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment." *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010); *Estate of Bennett v. Wainwright*, 548 F.3d 155, 159 (1st Cir. 2008).

Unlike the standard of review applied to an ordinary issue at summary judgment, however, the qualified immunity analysis "demands deference to the reasonable, if mistaken, actions of the movant." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009).

## III. PLAINTIFF CANNOT ESTABLISH THE DEFENDANTS' USE OF FORCE WAS EXCESSIVE

The plaintiff's §1983 claim against Roycroft and Jackson pursuant to the Fourth Amendment is premised on the notion that they used excessive force in effecting Miller's arrest and, thus, violated his constitutional rights.  To prevail on such a claim, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009) (*citing Graham v. Connor*, 490 U.S. 386, 396 (1989)). The degree of force to be used in any given situation is most often a judgment call, which sometimes must be made in a split second by a police officer confronted with rapidly evolving circumstances. *Gray v.Cummings,* 917 F.3d 1, 8-9 (1st Cir. 2019), and the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *See Graham*, 490 U.S. at 396.

The "totality" of factors includes "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Id*.

### A.  THE FIRST *GRAHAM* FACTOR – SEVERITY OF THE CRIME

When the subject of a seizure has not committed any crime, the first *Graham* factor ordinarily cuts in the subject's favor. *See Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016). Miller's failure to submit to Roycroft's orders was at most a minor crime and no crime was reported to have been committed by Miller; *see id.* at 899-900; however, there is an unusual twist: the 911 call was disconnected and the caller was very short on the phone. Where Anderson appeared frightened for her safety, and where Roycroft could not afford to spend time interrogating Anderson while Miller was yelling—out of sight and potentially in conflict with another person—and was instructed per BPD policy to prioritize

"quickly assess[ing] the situation and secur[ing] the scene," the first *Graham* factor was

unascertainable Roycroft at the time. (Ex. 3, 37-41; Ex. 5).

### B.  SECOND *GRAHAM* FACTOR – THREAT LEVEL TO SAFETY

Roycroft didn't know why the 911 call was disconnected; however, he knew Anderson

had called 911, and understood that Miller was delusional and might become violent if he knew

Anderson had called the police. Just before Roycroft made the decision to try to grab Miller's

arm, and to engage him in a cross-body hold, Miller's demeanor had suddenly shifted like a

"light switch" and he appeared to be trying to arm himself while charging into the residence,

toward Anderson. That Miller appeared to become enraged at the news Anderson had called the

police and began moving in Anderson's direction makes Roycroft's belief that Anderson was at

risk of serious bodily injury more reasonable, particularly given Miller's delusional state. As the

threat changes, so too should the degree of force. *See Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir.

2007) (holding that an increase of police force after arrestee ceased resisting arrest was clearly

unconstitutional). Given that Miller was making forward progress toward the golf clubs and

toward Anderson, Roycroft's grabbing Miller's arm and placing him into a hold were objectively

reasonable in light of these circumstances. Where Jackson knew much less than Roycroft but

observed Miller fighting with Roycroft and a golf club underneath Miller's torso, Jackson's half-

strength strikes that were specifically targeted to gain control over his right hand were also

objectively reasonable.

### C.  THIRD *GRAHAM* FACTOR – ACTIVE RESISTANCE OR EVASION BY FLIGHT

After the "light switch" flip, Miller was non-responsive to verbal commands by Roycroft

to stop moving toward and/or into the house, and resisted the attempts by the officers to restrain

him as the situation unfolded *rapidly*.  Although Miller's resistance may have been the product

of his mental illness, there is no question that he resisted the officers' attempts to restrain him. *See, e.g., Adle v. Maine State Police Dep't*, 279 F. Supp. at 353. Thereafter, Miller yanked his arm away from Roycroft and continued further into the house toward the table, apparently seeking to arm himself. When Roycroft placed Miller in a hold, he placed himself at further risk by choosing not to employ a takedown maneuver or tase Miller.

Miller's active resistance continued, even escalating as he slammed Roycroft against the slider in an attempt to dislodge him and cause him harm, and further as he pinned Roycroft's left arm underneath his (Miller's) own while dragging Roycroft toward the front of the house.  Then, once on the floor, Miller's purposeful "winching" maneuvers were recognized by Roycroft to be an offensive tactic and one designed to gain further leverage over Roycroft. All of these factors weigh heavily in favor of whatever minimal level of force Roycroft can fairly be deemed to have used while struggling with Miller.

### D.  THE FORCE USED ON MILLER WAS MINIMAL AND DIRECTLY RELATED TO THE LEVEL OF THREAT POSED BY HIM

Force must be proportional to the threat posed.  At each application of force, the level of force used was directly related to the level of threat posed by Miller—which increased significantly when he appeared to become suddenly enraged immediately after being told Anderson had called the police because she had concerns about him.  Anderson observed Roycroft issuing verbal commands in an effort to get Miller to stop; she also observed Roycroft being dragged by Miller across the floor, continuing to fight off the officers until the moment they were able to apply the handcuffs. And just like in *Justiano,* Miller was making forward progress toward Anderson and toward the golf clubs. *Justiniano v. Walker*, 986 F.3d 11, 36 (1st Cir. 2021). The Fourth Circuit has held that the presence of other officers decreases the level of appropriate force. *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016)

(basing, in part, its finding that less force was warranted on the fact that the plaintiff "was also outnumbered and surrounded by police officers and security guards" when the plaintiff was stationary, seated, clinging to a post, and refusing to move).  Where it was only Roycroft and Miller involved in the encounter, and where Roycroft was outweighed by Miller (Ex. 10, p. 1; Ex. 15, p. 10), Roycroft's markedly minimal application of force was objectively more reasonable.

### 1. Grabbing Miller's Arm

Roycroft's decision not to wait for backup before ascertaining Miller's status at the back of his home was similarly objectively reasonable.  Miller was yelling unintelligibly and had caused Anderson to be fearful and behave in a way that conveyed this fearfulness to Roycroft. She was positioned at the front of the house with no line of sight to Miller, who could have changed position or begun posing as-yet-unknown risks in the interim between when she last observed him and when she had the initial conversation with Roycroft.  And, had Roycroft failed to ascertain Miller's status and Miller had harmed himself or another in the interim while Roycroft remained idly out front, waiting for Jackson, Roycroft could be seen to have shirked his duties as a police officer.  *See Scarpa v. Murphy*, 806 F.2d 326, 329 (1st Cir. 1986)(finding no basis to fault defendant for acting without waiting for backup or first assessing whether a medical emergency existed where to have done so could be construed as a shirking of their duty).

Roycroft did not use any force until he believed Miller was seeking to arm himself; even then, he only grabbed his arm in an effort to get him to stop moving further into the house where Anderson was. Roycroft had to make a split-second decision when faced with the sudden, new circumstance of Miller charging into the home where Anderson was.  No jury could reasonably find there was no reasonable threat posed by Miller. *See Stamps v. Town of Framingham,* 813

F.3d 27, 41 (1st Cir. 2016); *see also Henry*, 652 F.3d at 533 (discussing an officer's drawing of his gun instead of his Taser, "this also was not a situation in which circumstances deprived [the officer] of the opportunity to fully consider" which weapon he had drawn….").  Roycroft's use of force was warranted due to Roycroft's apprehension that Miller's suddenly angry and purposeful actions after hearing Anderson had called the police because she was concerned about him significantly increased the likelihood that he would assault or otherwise harm Anderson if he entered the house unfettered. And even if Roycroft was mistaken about Miller's intentions as he tore open the slider and charged into the house, he had little, if any, time to consider the situation. *See McKenney v. Mangino*, No. 2:15-cv-00073-JDL, 2017 U.S. Dist. LEXIS 55649, at *33 (D. Me. Apr. 12, 2017), *citing Partlow v. Stadler*, 774 F.3d 497, 502-503 (8th Cir. 2014) (officers had "[m]ere seconds" to react).

2. *Roycroft Placing Miller in a Hold from Behind, With One Arm Around Miller's Shoulder and His Other Arm Underneath Miller's Left Arm*

It is undisputed that Miller had disregarded Roycroft's repeated verbal commands to stop first outside, then inside, the house.  After Miller had jerked his arm away from Roycroft, Roycroft reasonably believed Miller would not cease pursuing his mission, which appeared to be to harm Anderson. Roycroft was trained to ensure subjects' hands are clear of any weapons, and did not know whether Miller had been successful in locating what he appeared to be looking for—a weapon—from the small table that was in front of them and (due to Miller blocking it) outside his line of sight. Given his belief that Miller had become suddenly enraged at Anderson and was seeking to arm himself, ensuring Miller had not retrieved any weapons was paramount. While Roycroft could have applied a more aggressive takedown maneuver, his focus was moving Miller away from the table so he could see if he had anything in his hands.

That Roycroft's hold wasn't a "trained technique" is immaterial; it was undoubtedly less force than any alternative measure such as a leg sweep or other takedown maneuver. JBPD policy specifically trains that body holds and soft or empty hand restraint tactics are appropriate uses; while the term "seatbelt hold" may not be a term of art among BPD officers, this type of empty-hand control meausure was permitted and appropriate in the circumstances of the tight space and Roycroft's preference for the lowest use of force on a mentally ill individual. (Ex. 3 at 8-16; Ex. 18 at 73-78). Miller's level of resistance increased further when he slammed Roycroft against the slider door, knocking it out of its housing.  No reasonable juror could conclude that Miller did this for any purpose other than to resist Roycroft's attempt to restrain him. *See Gray v. Cummings*, 917 F.3d 1, 9 (1st Cir. 2019) (finding the district court's conclusion that the plaintiff was "actively resisting arrest "unimpugnable given [the defendant's] testimony that he asked [the plaintiff] several times to put her hands behind her back, but that she would not do so.")

3. *Period While Roycroft's Arm Was Trapped Involved Unintentional Use of Force and Is Therefore Not Subject to Fourth Amendment Liability*

Fourth Amendment liability attaches only to *intentional* conduct."  *Stamps v. Town of Framingham*, 813 F.3d 27, 38 (1st Cir. 2016).  Roycroft did not intentionally maintain his hold of Miller as he was being dragged by Miller across the floor; rather, he was *forced* to, or was under duress to, retain his hold on Miller.  Being dragged in a position where his upper arm was trapped reasonably caused Roycroft to believe that releasing his grip while his upper arm was trapped would have resulted in his own restraint by Miller, and would have eliminated any possible leverage he had against Miller's continued active resistance.  (Ex. 5 ¶86-87; Ex. 6 at 131-133, 143-144, 148, 184). Miller's apparently intentional trapping of Roycroft's left arm

under his own, therefore, renders Roycroft's actions subsequent to the trapping *unintentional* and inappropriate for Fourth Amendment liability consideration.

4. *Jackson's Use of Half-Strength Hand Strikes to Gain Control Over Miller's Right Hand*

Deploying a taser is a serious use of force. The weapon is designed to "caus[e] . . . excruciating pain," *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010), and application can burn a subject's flesh, *see Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008). Jackson appropriately relied on Roycroft's judgment—who, having been at the scene one minute sooner, had little awareness of the events that caused him to find Roycroft and Miller actively engaged in a struggle.

5. *Attempting to Restrain/Detain Miller to Prevent Harm Due to Mental Illness*

A police officer who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person. See Mass. Gen. Laws ch. 123, § 12(a). Roycroft reasonably believed this to be the case based on the "emergency" status of the abruptly disconnected 911 call, and the split-second unfolding of events foreclosed any opportunity to summon a physician or psychologist. (DFOS ⁋ 25, 52, 53, 56, and generally).

The fact that Miller was delusional did not preclude him from posing an immediate threat. First Circuit precedent instructs that excessive force claims involving persons with mental illness generally follow the same analysis as claims involving suspects apprehended for criminal conduct. *See, e.g., Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001) (recognizing the difficulties faced by staff who must deal with possibly violent mental patients).

Considering whether a reasonable jury could find that a defendant used excessive force in his deployment of a single taser in drive stun mode, the *Gray* court held that a reasonable jury

could find the level of force used was excessive where the plaintiff, who had been involuntarily committed under Gen. Laws ch. 123, § 12,  was "shuffling down the sidewalk barefoot and unarmed — only pos[ing] a danger to herself." *Gray v. Cummings*, 917 F.3d 1, 8-9 (1st Cir. 2019).  This was "especially" true, the court held, "given [the defendant's] "distinct height and weight advantage." *Id*. Such was not the case here, where Miller was strong and substantially outweighed both Roycroft and Anderson. (Ex. 10, p. 1; Ex. 13, p. 1).

While a "heightened level of care and concern may need to be applied when evaluating the use of reasonable force in lethal force cases where the individual is suicidal or troubled…that solicitude applies chiefly where the individual poses no real security risk to anyone other than themselves." *McKenney v. Mangino*, 873 F.3d 75, 82 (1st Cir. 2017); *see Justiniano v. Walker*, No. 15-CV-11587-DLC, 2018 U.S. Dist. LEXIS 169192, at *15-16 (D. Mass. Sep. 30, 2018) (the use of lethal force on an individual who was known to be mentally disturbed was justified given that decedent posed a genuine threat of harm to the defendant and others). Additionally, mentally ill people are more likely to behave unpredictably than mentally healthy individuals, especially if they are off of their psychotropic medication. (Ex. 18, Deposition of Scott DeFoe, p. 9-10).

Some degree of force—and certainly the low level applied by Roycroft—became reasonable once the "switch" was flipped and he appeared enraged and appeared to begin to pursue Anderson. *See Adle v. Maine State Police Dep't*, 279 F. Supp. 3d 337, 352-353 (D. Me. 2017) (finding "no guarantee" a mentally ill person "would not get up at any point and either attack or attempt to escape"); *see Silva v. Elliot Hosp.*, 2020 DNH 123 (summary judgment granted in part on grounds that plaintiff failed to point to any competent evidence suggesting mental illness was not taken into account when determining the amount of force reasonably

necessary to stop him from hurting himself, and where defendants tried to persuade him to comply by speaking with him calmly).

### E.  ALTERNATIVE MEANS IMMATERIAL EXCEPT TO SHOW THAT THE DEFENDANTS APPLIED A LOWER USE OF FORCE THAN NECESSARY

While it is possible another type of restraint was available to Roycroft, such as a takedown maneuver, and that Roycroft could have waited for Jackson to arrive, officers are not required to use the least intrusive means of response.  *See Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1377 (1st Cir. 1995)("[o]fficers…need only act within that range of conduct [which is] . . . reasonable.")(*quoting Scott*, 39 F.3d at 915)).  "*Graham* makes it clear that the fourth amendment does not require second-guessing," *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003), and proving the simple fact that the officers could have reduced the likelihood of a violent encounter with a different course of action does not establish a constitutional violation. *Montel v. City of Springfield*, 386 F. Supp. 3d 67, 77 (D. Mass. 2019) *citing Napier v. Town of Windham*, 187 F.3d 177, 188-89 (1st Cir. 1999) (plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to the deadly confrontation was imprudent, inappropriate or even reckless). Additionally, Roycroft's approach to Roycroft was justified in light of the 911 call that had been disconnected and Anderson's abject fear. The First Circuit has "not adopted the broad rule that officers have a duty to avoid creating situations which increase the risk that deadly force may be used. *Est. of Usaamah Abdullah Rahim v. Doe*, 51 F.4th 402, 418 n.14 (1st Cir. 2022).

Roycroft and Jackson also could have tased Miller during his active resistance through the use of a taser, chemical irritants or a baton. (Ex. 3, pp. 8-16).  Instead of applying this heightened level of force, however, Roycroft and Jackson put themselves at greater risk by physically engaging with Miller.  *See Parker v. Gerrish*, 547 F.3d 1, 10-11 (1st Cir. 2008) ("We

do not hold that the officers would have been required to physically wrestle [plaintiff] to the ground without recourse to the Taser. Rather, we find that the jury could have concluded that such a struggle would not have been necessary — that in the absence of the Taser, [plaintiff] would have submitted to cuffing without presenting a risk to the officers.") In *Parker*, the First Circuit found that a jury could have concluded that officers were not obliged to physically wrestle the suspect to the ground in the absence of use of the Taser. *See also Riley v. Allandydy*, No. 1:10-cv-218-GZS, 2012 U.S. Dist. LEXIS 157683, at \*41-42 (D.N.H. Aug. 24, 2012).

### F.  PLAINTIFF CANNOT PROVE CRITICAL ELEMENTS OF HIS CASE

Although juries have some leeway to "reject uncontradicted, unimpeached testimony when it is improbable, inherently contradictory, riddled with omissions, or delivered in a manner giving rise to doubts," *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76 (1st Cir. 2002), that principle has no application here because Roycroft's and Jackson's testimony has been consistent and is corroborated wherever possible by Anderson, the only other eyewitness. *See Gray v.Cummings*, 917 F.3d 1, 5-6 (1st Cir. 2019) (eliciting many of the facts from the defendant's account); *Harriman v. Hancock County*, 627 F.3d 22, 34 (1st Cir. 2010) (no material factual dispute when plaintiff had no memory of being beaten); *see also Wertish v. Krueger*, 433 F.3d 1062, 1065 (8th Cir. 2006) (deeming police officer's version of events "unrefuted" when plaintiff testified that he had very little memory of relevant events); *see Silva v. Elliot Hosp.*, 2020 DNH 123 (July 2020) (notwithstanding plaintiff's own testimony he was kicked in the head, record lacked any competent evidence of this fact).

There is no credible eyewitness testimony regarding the positioning of Miller's body or the timing of events places into dispute any material fact surrounding the struggle. Anderson did not witness anything that transpired on the back deck, and has no recollection of what position

Miller was in or when he made the statements "I can't breathe," and "Help me, Amy." Anderson does recall that the officers were responsive to her question as to whether he could breathe, suggesting she asked them this question after Miller's level of consciousness was in question. Regardless, Anderson recalls resuscitative measures beginning immediately after this exchange and there is no dispute they immediately called for medical assistance. (DFOS ⁋129-130; Ex. 19 at 00:02:43). Moreover, Anderson cannot distinguish which officer did what, rendering it impossible for a jury to do the same as to any facts deriving solely from her testimony. Without more, the plaintiff's claims must fail.

### G.  THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

For the foregoing reasons, this case exemplifies precisely the type of "split-second judgment" police officers are forced to make heading into unknown circumstances that rapidly evolve. The doctrine of qualified immunity is designed to protect "all but the plainly incompetent [and] those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Government officials are entitled to qualified immunity unless their conduct constitutes a violation of federal law, the contours of which were "clearly established" at the time such that a reasonable officer would have understood his conduct violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201-06 (2001). "The plaintiff's burden to demonstrate that the law was clearly established is thus 'a heavy burden indeed.'" *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (*quoting Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021)). The particularity requirement of the "clearly established" inquiry is especially stringent in excessive force cases, as officers are required to make quick judgments under pressure. *Jennings v. Jones*, 499 F.3d 2, 28-29 (1st Cir. 2007).

Even assuming Miller's constitutional rights were violated, the contours of the law at the time Roycroft and Jackson responded to 45 Elm Street on April 16, 2019 were not so clearly defined such that they would have known that a disconnected—and therefore more urgent—911 call labeled by dispatch as a "mental health emergency" required them to spend time planning a tactical approach or, in Roycroft's case, to get more information from Anderson or wait for Jackson to arrive. As for his initial conversation with Miller, who was relatively calm at first (while he was talking to the sky), there was no precedent to inform Roycroft that engaging in further conversation or explaining that Anderson's concerns were what had led him to Miller's backyard was violative of Miller's constitutional rights. Similar to *Justiniano,* the tragic end to the encounter invites wishful hindsight, *Justiniano v. Walker*, 986 F.3d at 29; however, no reasonable officer standing in Roycroft's or Jackson's position would have understood that grabbing Miller's arm or placing him in a hold, or delivering half-strength hand strikes in that context clearly violated Miller's constitutional rights. And the undisputed facts do not support a reasonable inference that the nature of any of Miller's movements forward into the house was anything other than aggressive if not downright threatening. *See id.* (finding same despite behavior of plaintiff being due to his mental state). *See, e.g., Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000). From an objective standpoint, a reasonable officer could have believed Miller posed a threat, and thus that same reasonable officer, in Roycroft's position, would not have believed that the initial arm-grab, then cross-body hold on Miller constituted a violation of his constitutional rights. A contrary finding, even a contrary inference, is simply not supportable on the evidence here, *See Justiniano*, 986 F.3d at 36, and any suggestion that Roycroft should have waited for backup or obtained more information from Anderson might be a "helpful suggestion to law enforcement," but the plaintiff can cite to no authority that Roycroft

had a clearly established duty to do so. *See Napier v. Town of Windham*, 187 F.3d 177, 188-189 (1st Cir. 1999).

In *Napier*, the court rejected the contention that *St. Hilaire* stood for the proposition that the police cannot evoke exigencies of the moment created by their own unreasonable conduct as justification for inflicting deadly force that, but for their blunders, would never have been used. *Napier v. Town of Windham*, 187 F.3d 177, 188-189 (1st Cir. 1999). Nothing close to lethal force was used by the officers, who first attempted to de-escalate the situation with caring conversation (Roycroft), then by opting for an empty-hand control tactic over a takedown maneuver (Roycroft), by issuing verbal commands (both), and by opting not to tase Miller and instead to continue their physical struggle (both).  Once Miller appeared to become enraged at the news Anderson had called the police and began moving in Anderson's direction, Anderson was at risk of serious bodily injury from Miller (who was delusional and whose actions were indisputably unpredictable). Unlike in *McCue v. City of Bangor*, 838 F.3d 55, 65 (1st Cir. 2016) (mentally ill individual died in a five-point restraint after four minutes of sustained and significant pressure to his back *after* he had ceased resisting arrest), there is no evidence of any sustained pressure to Miller's back *or*—perhaps more importantly—that Miller remained prone after he ceased resisting.

Even assuming Miller's rights were violated, the violation was not obvious to a reasonable officer. Two months prior to the defendants' encounter with Miller, the First Circuit issued its decision in *Gray v. Cummings,* 917 F.3d 1 (1st Cir. 2019).  In *Gray*, a police officer who did not know whether the plaintiff had been deemed a danger to others or only herself tased a mentally ill woman who was non-compliant with the officer's verbal commands. *Id*. The First Circuit found the defendant was entitled to qualified immunity, stating, "[g]iven the skimpiness

of [the information the officer had], we think that an objectively reasonable police officer, standing in [the defendant]'s shoes, would have had to be prepared for the worst." *Id*. at 12. *See also S.B. v. Cnty of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017)(officer entitled to qualified immunity after shooting mentally ill and intoxicated man who held a knife and failed to comply with officer's orders); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1029 (9th Cir. 2018)(officers entitled to qualified immunity for using deadly force on mentally ill and intoxicated man who charged officers with scissors raised). The defendants reasonably moved quickly given that a delay "would gravely endanger their lives or the lives of others." *Soto-Cintrón v. United States*, 901 F.3d 29, 36 (1st Cir. 2018), *quoting City & Cnty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1775, 191 L. Ed. 2d 856 (2015) (applying qualified immunity) (internal citations omitted).

### IV. M.G.L. c. 229 § 2

Under M.G.L. c. 229, § 2, a person may be liable for the death of another if the death is caused by the person's negligence or a willful, wanton or reckless act. The plaintiff's wrongful death claim "lives or dies depending on the outcome" of Count I (pursuant to § 1983). *See Justiniano v.Walker*, No. 15-CV-11587-DLC, 2018 U.S. Dist. LEXIS 169192, at *20 (D. Mass. Sep. 30, 2018). As neither Roycroft nor Jackson used unreasonable force or violated Miller's constitutional rights, the plaintiff's theory of liability underlying Count II (M.G.L. c. 229 § 2) must also fail as a matter of law.

### V. CONCLUSION

Wherefore, the defendants, Sean Roycroft and Spencer Jackson, respectfully request the Court GRANT summary judgment in their favor as to all claims.

The Defendants,
SEAN ROYCROFT and
SPENCER JACKSON

By their attorneys,

*/s/ Alexandra M. Gill*
Douglas I. Louison, BBO 545191
dlouison@lccplaw.com
Alexandra M. Gill, BBO 663040
sgill@lccplaw.com
LOUISON, COSTELLO, CONDON & PFAFF,
LLP
10 Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305


**CERTIFICATE OF SERVICE**

I, Alexandra M. Gill, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Alexandra M. Gill*
Alexandra M. Gill

Dated:  May 22, 2023