UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>ESTATE OF ROBERT JOSEPH MILLER, )<br>by and through IAN MILLER, personal )<br>representative of the Estate, )<br> )<br>      Plaintiff, )<br> )<br> )<br>v. )<br> )<br>SEAN ROYCROFT and SPENCER )<br>JACKSON, in their individual capacities, )<br> )<br>      Defendants. )<br>_____ ) | Civil Action No. 21-CV-10738-AK |

**MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

      This case arises from the death of Robert Miller while he was being restrained by two law enforcement officers after his partner called 911 and asked for assistance during a mental health crisis.  Ian Miller, as personal representative of his father's estate, filed this 42 U.S.C. § 1983 lawsuit against two Barnstable Police Department officers, Sean Roycroft and Spencer Jackson, alleging violations of his father's Fourth Amendment rights (Count I) and wrongful death pursuant to Mass. Gen. Laws ch. 229, § 2 (Count II).  After carefully reviewing the record and considering the parties' arguments, this Court **DENIES** Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

      In evaluating a motion for summary judgment, the Court relies on the parties' statements of material facts [Dkts. 59, 64], the Plaintiff's opposition [Dkt. 65], and the Defendants' reply to

the opposition [Dkt. 67] as well as the exhibits the parties have submitted [Dkts. 59-1–19, 66-1–14].  The Court also heard oral argument on March 14, 2024.  [Dkt. 74].  The facts are stated in the light most favorable to the Plaintiff unless otherwise noted.

**Procedural Background**

Ian Miller, as personal representative of his father's estate, filed suit against the Town of Barnstable and two Barnstable police officers, pleading a federal claim under 42 U.S.C. § 1983 and two state-law claims.  [Dkt. 1].  On January 24, 2022, the parties stipulated to dismissal with prejudice of the negligence claim against the Town of Barnstable, pursuant to Mass. Gen. L. ch. 258 (Count III).  [Dkt. 30].  Since that was the only count against the town, Barnstable was terminated from the case.  On May 22, 2023, Sean Roycroft and Spencer Jackson filed a Motion for Summary Judgment [Dkt. 57], which Plaintiff opposed.  [Dkt. 65].

**The 911 Call**

At 7:03:56 p.m. on April 16, 2019, the Barnstable Police Department ("BPD") dispatch received a 911 call from Amy Anderson that was logged into the BPD computer system as a "mental health emergency."  [Dkt. 59 at ¶ 5].  Anderson said she was at 45 Elm Street and, "We need the police. There is someone very delusional here, my husband."  [Dkt. 64 at 2].  When asked who was delusional, she said, "he is, and he needs a psych evaluation.  It's very frightening."  [Id.; Dkt. 59-19].  After confirming the address, she gave her first name and then hung up.  [Id.].  At 7:06 p.m., the dispatch entered the following description of the call into the BPD computer system: "[Reporting Party] stated husband is having a psychotic break. Very short on phone.  Caller disconnected, no further information."  [Dkts. 59 at 2; 59-19].

The individual who made the call to 911 was Amy Anderson ("Anderson"), Robert Miller's long-time girlfriend who lived with him at 45 Elm Street. [Dkt. 59 at ¶ 7].  Officer Sean

Roycroft ("Roycroft") was dispatched to 45 Elm Street at 7:07:37 p.m. and arrived at the scene at 7:09:28 p.m.  [Id. at ¶ 8].  A second officer, Spencer Jackson ("Jackson"), was dispatched to 45 Elm Street at 7:07:47 p.m. and arrived at the scene at 7:10:36 p.m.  [Id. at ¶ 9].

Roycroft, who had been a Barnstable police officer for 30 years [Dkt. 64 at ¶ 150], was trained to follow BPD intervention guidelines in responding to calls involving mentally ill individuals, which instruct officers to prioritize quickly assessing the situation and securing the scene.  [Dkt. 59 at ¶ 15].  Before arriving at 45 Elm Street, Roycroft knew that the caller's husband was experiencing a psychotic break and that the caller had been short on the phone.  [Id. at ¶ 10].  Roycroft was also aware that the call was labeled an "emergency" and had been disconnected, which added an additional layer of concern to the call.  [Id. at ¶ 12].  Roycroft radioed into dispatch that he was going to the scene, and he heard Jackson say over the radio that he was responding to the scene as well. [Id. at ¶ 13].

Upon arriving at the residence, Anderson met Roycroft at the front door.  [Id. at ¶ 19].  It seemed to him that she had been waiting there for him; she was urgently whispering to him through a partially open front door and a closed screen door, "He's out back.  He's out back." [Id.].  Anderson told Roycroft that Miller was hallucinating and talking to people who were not there, and had not taken his medications or slept in days.  [Id. at ¶ 20].

Anderson also told Roycroft she was very concerned Miller would be angry at her for calling the police, and Roycroft recognized that Miller might become angry if he found Roycroft speaking to Anderson.  [Id. at ¶ 23].  While she stood there, Anderson was checking behind her to see if anyone was approaching her from inside the house.  [Id. at ¶ 26].  Based on her body language, Roycroft believed Anderson to be "in fear" regarding Miller's behavior.  [Id. at ¶ 25].

Roycroft spoke to Anderson for a very short time.  He asked her simple questions, and she answered all of them.  [Dkt. 64 at ¶ 161].  Roycroft did not ask Anderson why the 911 call had been disconnected.  [Id. at ¶ 165].  He did not ask if there were other people inside the house. [Id. at ¶ 162].  He did not ask if Anderson was afraid of Miller or if there were weapons in the home.  [Id.].  He did not ask whether she would like to go to a safe place, such as a neighbor's house.  [Id.].  He did not ask for how long Miller had been in a psychotic state.  [Id.].

Roycroft asked Anderson whether she felt safe staying inside the house while he went to check on Miller, and she indicated that she felt comfortable staying inside the house.  [Dkt. 59 at ¶¶ 24, 33].  Anderson and Roycroft discussed the best way for him to approach Miller, and she suggested that Roycroft stay outside and go around the right side of the house rather than through the house.  [Id. at ¶ 32].  Roycroft asked Anderson what Miller's first name was to help him establish a rapport with him, and she replied that it was Robert.  [Id. at ¶ 34].  Roycroft could hear Miller yelling on the back deck while he spoke with Anderson.  [Dkt. 64 at ¶ 166].  He did not consider this an emergency.  [Id.].  Roycroft knew Jackson would be arriving at any moment but decided to walk around the side of the house without waiting for backup to evaluate Miller's mental health.  [Dkts. 64 at ¶ 168; 59-4 at 47].  Anderson retreated into the front interior part of the house and did not hear or witness the exchange between Miller and Roycroft until they entered the house.  [Dkt. 59 at ¶ 37].

**The Encounter**

Roycroft initially observed Miller from a position where Miller could not see him.  [Dkt. 59-4 at 16].  He noticed that Miller was out of touch with reality and yelling while looking up at the sky, and he was barefoot and shirtless.  [Dkt. 64 at 34-35].  No one else was present behind the house.  [Id. at ¶ 170].  Miller looked disheveled and he was sweating.  [Id.].  Roycroft also

noticed that Miller looked frazzled; his eyes were bloodshot and he had an empty and unfocused stare.  [Dkts. 64 at ¶ 175; 59 at 6].  Observing Miller, it looked to Roycroft as if Miller was having a psychotic break.  [Dkt. 64 at ¶ 171].  Roycroft understood that when a person is having a psychotic episode, it can become a medical episode. [Id. at ¶ 172].

Roycroft had received training to respond to calls involving individuals experiencing mental health crises in a calm, friendly, and non-threatening manner.  [Dkt. 59 at ¶ 42].  Roycroft approached Miller and said something along the lines of, "What's going on, Robert?" or "Hi, Robert, how're you doing?" or "How's it going?"  [Id. at ¶ 43].  Miller replied that he was conversing with nature, to which Roycroft responded, "I do that sometimes" or "I do that from time to time, absolutely nothing wrong with that.  That's great."  He then asked Miller, "Can I have a conversation with you?" or "What do you think about you and I having a conversation? Can we have—can we have a conversation here?"  [Id. at ¶ 44].  Miller replied, "Sure, we can" and either invited or gave Roycroft the impression that he was welcome to come up onto the deck to continue the conversation.  [Id. at ¶ 45].

Roycroft stepped onto the deck, keeping several feet of distance between himself and Miller.  [Id. at ¶ 46].  Miller noticed a broken flowerpot or figurine and some dumbbells nearby. [Id.].  Roycroft understood that in approaching a mentally ill person, a police officer should not say something that might upset or anger the person.  [Dkt. 64 at ¶ 176].  After some initial conversation on the deck, Roycroft said, "Your wife called because she has some concerns about you," and asked again if they could talk.  [Dkts. 64 at ¶ 177; 59 at ¶ 47].  Upon hearing this, Miller stared at the ground for "several long seconds," and his demeanor shifted from calm to angry.  [Dkt. 64 at ¶ 178].  Miller abruptly turned toward the house and approached the broken ceramic pieces on the deck.  [Dkt. 59 at ¶ 48].  Roycroft stayed close to Miller, who stopped as

he reached the house, grunting and angrily shaking his fists.  [Id. at ¶ 50].  To Roycroft it appeared as if Miller had "flipped a switch."  [Id. at ¶ 49].  Miller then said, "Fuck you I'm not talking with you get the fuck away from me," and quickly entered his home through the sliding door on the deck.  [Dkt. 64 at ¶ 180].

After Miller swore at him, Roycroft issued repeated orders for Miller to stop as the two of them approached the house, but Miller did not comply.  [Dkt. 59 at ¶ 54].  Roycroft knew that people experiencing psychosis may be unpredictable.  [Dkt. 64 at ¶ 182].  They may not be expected to follow his orders or commands or even recognize that he is a police officer.  [Id.].

Miller pulled open the slider door leading to the back of the house and stepped inside.  [Dkt. 59 at ¶ 55].  Because Miller did not respond to his commands, Roycroft followed Miller into his home.  [Dkt. 64 at ¶ 183].  Inside, there was a dining room table in front of the sliding door.  [Id. at ¶ 184].  Roycroft stayed directly behind Miller, as Roycroft believed Miller wanted to find Anderson.  [Dkts. 59 at 8; 59-5 at 9; 59-6 at 5].  Roycroft grabbed Miller by the arm to get his attention.  [Dkt. 59 at ¶ 58].  Miller continued to ignore all verbal commands and pulled his arm away from Roycroft.  [Dkt. 64 at ¶ 185].  Parties dispute whether this gesture caused Miller's body to reach over the table or if he deliberately "dove onto the table."  [Dkt. 68 at 38].  According to Roycroft, Miller began reaching on the table.  [Dkts. 59 at ¶ 59; 59-4 at 31].  Roycroft could tell that the table was cluttered with various objects but could not see exactly what was on it.  [Dkt. 59 at ¶ 60].  Roycroft stated he could not see Miller's hands in those moments, and he thought Miller might grab a weapon from the table.  [Dkt. 64 at ¶ 188].  Miller did not in fact grab anything, nor did he threaten to.  [Id. at 14].

Standing between the sliding door to the deck and the dining table, Roycroft tried to grab Miller from behind by reaching his arms around Miller's front, putting his left arm under

Miller's left arm and his right arm over Miller's right shoulder, and connecting his hands at Miller's chest.  [Dkt. 59 at ¶ 66].  Roycroft described this hold as a "seatbelt hold," indicating the positioning of the diagonal cross-body strap of a seat belt.  [Id. at ¶ 67].  At this point, Roycroft was no longer standing directly behind Miller; he was further to Miller's left.  [Dkt. 64 at ¶ 192].  By applying this hold on Miller, Roycroft was able to pull Miller back, away from the table.  [Dkt. 59 at ¶ 68].   The men's bodies hit the sliding door and knocked it out of its frame.  [Dkt. 64 at ¶ 200].  Anderson, who had been unable to hear or see any of the exchange between Roycroft and Miller up until this point, was able to witness some of their interactions at around the time she heard them crash against the slider door.  [Dkt. 59 at ¶ 72].  Anderson described the hold Roycroft applied to Miller as a "bear hug."  [Id. at ¶ 73].  Anderson does not remember the exact positioning of Roycroft's arms or hands but heard Roycroft issue many verbal commands to try to get Miller to stop or comply and put his hands behind his back.  [Id. at ¶ 74].

**Jackson's Arrival**

Jackson arrived at 45 Elm Street one minute after Roycroft.  [Dkt. 64 at ¶ 204].  Jackson was at the back corner of the house when he heard a loud crash caused by Roycroft and Miller slamming back against the slider door.  [Dkt. 59 at ¶ 82].

After hitting the slider door, Miller pulled his body forward while Roycroft continued applying a seatbelt hold. The forward momentum of the two men caused the table to be pushed to the side.  [Dkt. 64 at ¶ 201].  They moved in a continuous movement from the door, past the table, to a small office area.  [Id.].  Anderson was attempting to watch Roycroft and Miller while peering from another room but was unable to see everything.  [Dkt. 59 at ¶ 78].  Roycroft did not attempt any other use-of-force techniques to take Miller down before they reached the step down to a small, recessed office area at the front of the house.  [Id. at ¶ 88].

As the two were progressing toward the office area, at some point Roycroft noticed a set of golf clubs in the office area and a single golf club on the floor.  [Dkt. 59 at ¶ 86].  Miller did not grab a golf club, nor did he threaten to grab one.  [Dkt. 64 at ¶ 203].  Roycroft nevertheless perceived Miller to be focusing on reaching the golf clubs.  [Dkt. 59 at ¶ 87].  Roycroft continued issuing verbal commands and holding onto Miller to prevent him from making forward progress toward the clubs.  [Id.].

Upon entering the house from the back through the dislodged slider entrance, Jackson observed Roycroft and Miller, moving together, take three to four steps toward the front of the house and fall forward after tripping on a step into the recessed office area, landing face down on top of the single golf club.  [Dkts. Id. at ¶ 88-89; 64 at ¶ 205].  Roycroft fell to the left of Miller, and Roycroft's hands, which had previously been connected around the front of Miller's chest, became disengaged.  [Dkt. 59 at ¶ 90].  Miller was facing the ground, with both his arms underneath his body.  [Id. ¶ 91].  Roycroft fell to Miller's left side with his left arm trapped underneath Miller and between Miller's left arm and the left side of Miller's body, and his right arm draped between Miller's shoulder blades.  [Id. at ¶ 92].  Roycroft attempted to pull his left arm out from underneath Miller but was unable.  [Id. at ¶ 93].  Miller was pulling his left arm into his body, while Roycroft's arm was still in the seatbelt hold.  [Dkt. 64 at ¶ 93].  Miller was trying to get up by lifting his chest and pulling his elbows under him.  [Id.].

While he was walking towards the office, Jackson observed Anderson standing inside another room, away from the doorway connecting the two rooms.  [Id. at 22].  Jackson approached and saw that Roycroft had fallen off to Miller's left side with his left arm trapped underneath Miller's torso.  [Dkt. 59 at ¶ 94].  A portion of Roycroft's chest and right forearm were on top of Miller, while Miller's arms were underneath him.  [Id.].  Jackson announced his

arrival on the scene to Roycroft [Id. at ¶ 95] and stepped to the right side of Miller's body.  [Dkt. 64 at ¶ 206].  Roycroft told Jackson that Miller might have something in his hands, or that he could not see his hands.  [Dkt. 59 at ¶ 96].  Jackson was unable to see Miller's hands and therefore could not determine whether Miller was holding anything or had picked anything up.  [Id. at ¶ 100].  Roycroft, whose left arm was still pinned underneath Miller, continuously tried to pull it out from underneath Miller's body.  [Id. at ¶ 101].

Defendants claim Miller was actively resisting both officers' attempts to restrain him [Id. at 13-14], whereas the Plaintiff states that Miller's attempts to breathe were improperly treated as resistance.  [Dkt. 64 at ¶ 103].  Miller was trying to push up to breathe by bringing his chest up.  [Dkts. 64 at ¶ 207; 59-4 at 35].  Roycroft reacted to Miller pushing up by applying pressure on Miller's back between his shoulder blades.  [Id.].  When Miller pushed up, Roycroft pushed down.  [Dkt. 59-4 at 35].  Roycroft believed Miller was trying to push up, so that he could tighten his grip on Roycroft's left arm.  [Dkt. 59 at ¶ 102].

Roycroft was on Miller's left side, "more on his left hip," with his right leg over Miller's left leg and his right arm draped between Miller's shoulders and his left arm trapped underneath Miller.  [Id. at ¶ 104].  The two officers gave repeated, verbal commands to Miller to stop, let go, and stop resisting.  [Id. at ¶ 105].  Jackson asked Roycroft if he should use his taser on Miller, but Roycroft directed him not to.  [Id. at ¶ 106].  Roycroft believed that he and Jackson would be able to restrain Miller without escalating the level of force used on Miller.  [Id. at ¶ 107].

During the struggle, Miller was moving around in ways that, to Roycroft, demonstrated an intent to stay in the position he was in, face down with his arms underneath him, and gain a dominant position over Roycroft.  [Id. at ¶ 109].  During the altercation, Miller disregarded the officers' verbal commands and kicked and flailed his legs in the air, but he did not punch, kick,

or otherwise strike Roycroft or Jackson.  [Dkts. 64 at ¶ 209; 59 at ¶ 111].  Nor did he threaten the two officers.  [Dkt. 60 at ¶ 209].

Because his left arm was trapped underneath Miller, Roycroft was concerned for his own safety.  [Dkt. 59 at ¶ 112].  Jackson delivered a half-strength punch to the right side of Miller's body to distract Miller to gain control over his hands and handcuff him.  [Id. at ¶ 114]. Immediately after this half-strength punch, Jackson partially moved Miller's right arm from underneath his body.  [Dkts. 59 at ¶ 115; 59-4 at 38].  Miller then pulled his body toward Roycroft and yanked his arm back underneath his torso.  [Dkt. 59 at ¶ 116].  Jackson delivered another half strength punch in the same area of Miller's body and managed to pull Miller's right hand out from underneath his own body and placed handcuffs on Miller's right wrist.  [Dkts. 59 at ¶¶ 120, 123; 59-4 at 38].  Miller made groaning noises after each empty hand punch.  [Dkt. 59 ¶ 122].  For the first time, Jackson observed Miller's right fist was clenched, but with nothing protruding from it.  [Id. at ¶ 121].   Roycroft was able to remove Miller's left hand from underneath him immediately after Miller's right arm was under control.  [Id. at ¶124].  Jackson double-locked the handcuffs on Miller.  [Id. at ¶ 125].  While on the floor and until the handcuffs were applied, Miller's hands had remained tucked underneath his body, out of sight, despite both officers' attempts to free his hands from underneath his torso.  [Id. at ¶ 127].   Anderson's memory is unclear as to the sequence of events or how anyone was positioned at any given moment.  [Dkt. 64 at ¶ 129].

While the officers attempted to handcuff Miller, Anderson remembers him saying, "I can't breathe."  [Id. at ¶ 130].  Miller was still breathing and moving after he was handcuffed, and a few moments later Anderson noticed that Miller had stopped moving.  [Id. at ¶ 218]. Anderson remembers seeing one of the officers placing his knee on Miller's back to create a

leverage point for getting the handcuffs on Miller.  [Dkt. 59 at ¶ 144].  Anderson asked, "Can he breathe?" and Roycroft or Jackson responded, "Yes, he can breathe."  [Dkt. 64 at ¶ 126].  Then Miller said, "Amy, help me." [Id. at ¶ 213].  At around that time, Anderson observed Miller had stopped moving one of his legs and heard one of the officers ask, "Did he go out?" [Dkts. 59 at ¶ 141; 59-8 at 69].

Anderson is unable to remember where Miller was located or in what position he was in when he stated that he could not breathe. [Dkt. 59 at ¶ 139].  Although one of the officers responded to Anderson's question as to whether Miller could breathe, they did not take action to help him breathe.  [Dkt. 64 at ¶ 214].  Roycroft continued to apply pressure on Miller's body. [Id.].  Jackson and Roycroft knew that if someone was having difficulty breathing, the officers should take action.  [Id. at ¶ 215].  Roycroft knew he could reduce or eliminate breathing problems for a person in custody on their stomach by getting them off their stomach.  [Id. at ¶ 216].  Jackson knew that obesity, age, and physical condition were factors that could make it more difficult for a person to breathe if they were left lying on their stomach.  [Id. at ¶ 217].

The officers stated neither of them heard Miller gasp for air, heard him say he could not breathe, observed any signs that Miller was in respiratory distress or unable to breathe, or observed anything about Miller's behavior that indicated he was experiencing a medical event. [Dkt. 59 at ¶ 126].  Defendants state neither of them heard Miller or Anderson say anything throughout the struggle from the moment Miller entered the house.  [Id. at ¶ 128].

Once Miller was handcuffed, Jackson got up to speak with Anderson and to obtain information from her about Miller.  [Id. at ¶ 132].  As soon as the handcuffs were on Miller, Roycroft told him he was going to help him to his feet.  [Id. at ¶ 133].  Roycroft reached down to grab Miller's left arm and help him stand up.  [Id. at ¶ 219].  Roycroft tried to get Miller to stand

up.  [Id. at ¶ 220].  At first, Roycroft thought Miller's unresponsiveness was him passively resisting, so Roycroft knelt down next to Miller.  [Id. at ¶ 219-20].  Miller's pupils were fixed. [Id. at ¶ 220].

Roycroft immediately notified Jackson that Miller might be experiencing a medical event and the handcuffs were removed from his wrists.  [Dkt. 59 at ¶ 135].  Roycroft then moved Miller into the recovery position and determined that Miller had no pulse and there were no signs he was breathing.  [Dkts. 64 at ¶ 220; 59 at ¶ 136].  Roycroft began CPR and called for an ambulance at 7:12:58 p.m.  [Dkt. 64 at ¶ 221].

The officers' attempt to handcuff Miller lasted over a minute.  [Id. at ¶ 222].  Roycroft made an inadvertent radio transmission at 7:11:43 p.m., which was after the officers were both at Miller's side and Jackson had delivered his first punch.  [Id.].  Roycroft's radio call for medical assistance was at 7:12:58, one minute and 15 seconds later.  [Id.].  Roycroft called for an ambulance three and a half minutes after he logged his arrival at the scene.  [Id. at ¶ 223].

**The Medical Reports**

Additional BPD officers and EMTs arrived.  [Id. at ¶ 224].  EMTs attempted to provide life-saving emergency medical care.  [Id. at ¶ 225].  They used an Automated External Defibrillator, but it advised no shock because Miller's heart was in pulseless electrical activity ("PEA").  [Id.].  Miller's heart remained in PEA. [Id.].  He was pronounced dead later that night at 8 p.m.  [Dkt. 59 at ¶ 142].  The ambulance report states:

> Officers sts "we were here for mental health evaluation and pt was calm and cooperative at first. He got angry and went for a golf club and we took him down and cuffed him. He was talking and we stood him up and started to walk out and he collapsed, we immediately started CPR and applied AED."

[Dkt. 64 at ¶ 226].  Defendants state that this information is false.  [Id.].  Roycroft denies making this statement to the EMT, Vicki Yefko.  [Dkt. 59-4 at 40].  Jackson does not remember making this statement.  [Id.].

Miller's cause of death is disputed.  The medical examiner who performed an autopsy on Miller, Dr. William Zane, concluded that Miller died of cardiac dysrhythmia in the setting of excited delirium "due to unknown psychiatric illness" at the time of restraint.  [Dkt. 59-1].  Dr. Zane deemed Miller's manner of death was "natural."  [Id.].

Alon Steinberg, M.D., a cardiologist hired by the Plaintiff, disagreed with this conclusion.  [Dkt. 66-11 at 7].  He criticized Dr. Zane's attribution, stating that excited delirium is an "outdated" and "scientifically discredited concept" that is "problematic and unhelpful" because it is an "unproven rationale for ignoring the potentially fatal effects of restraint-related asphyxia when a death has occurred in police custody."  [Dkt. 66-3 at 1].  He concluded that the restraint applied to Miller while he was prone, being handcuffed, and with the partial bodyweight torso compression from Roycroft, combined with exertion, psychosis, and inflicted pain, most likely triggered the cardiopulmonary arrest that resulted in Miller's death.  [Dkt. 66-11 at 9].  Ultimately, Defendants' actions caused Miller to die "due to prone restraint cardiac arrest."  [Id. at 6-7].  Dr. Steinberg stated that had Miller not been in the struggle with the Defendants and placed in the prone position, he would have survived that day and would likely be alive today.  [Id. at 7].

Dr. Michael Freeman, an expert on forensic medicine and forensic epidemiology that Plaintiff hired, made a similar conclusion.  In his report, Dr. Freeman explained that the circumstances leading to Miller's death were consistent with cardiopulmonary arrest triggered by "asphyxial prone abdomen/chest compression," also known as positional asphyxia.  [Dkt. 66-3 at

8].  Positional asphyxia refers to an "increased difficulty with breathing that is associated with the use of restraint (i.e., handcuffs . . . ) that is used on a prone person."  [Id.]

Miller was in a psychotic state, and he was sweating when Roycroft first saw him, suggestive of a high metabolic state.  [Dkts. 64 at ¶ 227].  Roycroft placed plaintiff in a "seatbelt hold," then restrained him in a face down position.  [Id.].  Every time Miller pushed up in an attempt to breathe, Roycroft understood this movement to be active resistance and would push down.  [Dkt. 59-4 at 35].  Both the use of force expert Scott DeFoe and a Department of Justice bulletin published in 1995 describe this as the "basic physiology of a struggle."  [Dkts. 66-1 at 19; 66-12 at 1].

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment may be granted when the record presents no "genuine dispute as to any material fact and the mov[ing party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence;" and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law."  Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").  When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inference are to be drawn in [their] favor." Anderson, 477 U.S. at 256.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the nonmoving party's case.'"  Rakes v. United States, 352 F.Supp.2d 47,52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325).  Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute.  Mendes v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994) (citing Celotex, 477 U.S. at 325).

## III.    DISCUSSION

### A.    Qualified Immunity

The doctrine of qualified immunity shields government officials from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

To establish whether officers Roycroft and Jackson are entitled to qualified immunity at the summary judgment stage, the Court must engage in a two-pronged inquiry.  First, the Court must determine whether the facts show the officers' conduct violated a federal statutory or constitutional right.  Tolan v. Cotton, 572 U.S. 650, 655-56 (2014).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."  Id. at 656.

### 1. Constitutional Violation—Excessive Force

Beginning with the first prong of qualified immunity, the Court considers whether Plaintiff raised a genuine issue of material fact regarding whether Miller's federal rights were violated.  Plaintiff alleges that Defendants used excessive force while restraining Miller, causing his death in violation of 42 U.S.C. § 1983.  [Dkt. 1 at 8].  Since an excessive force claim arises out of the Fourth Amendment, the test applied is whether the force was reasonable.  Graham v. Connor, 490 U.S. 386, 396 (1989).  "Where an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk is so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny."  Stamps v. Town of Framingham, 813 F.3d 27, 35 (1st Cir. 2016).

The legal standard for evaluating whether a police officer used excessive force is objective reasonableness.  Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 70 (1st Cir. 2016).  Thus, courts do not consider an officer's subjective "intent or motivation."  Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (quoting Graham, 490 U.S. at 397).  The Supreme Court has instructed courts to consider three factors when evaluating excessive force claims under a Fourth Amendment standard of reasonableness: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of officers or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.

As there is no "precise definition" of reasonableness, courts must pay "careful attention to the facts and circumstances of each particular case."  Id.  The level of constitutionally permissible force when dealing with a mentally ill person "differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community."  Gray v. Cummings, 917 F.3d 1, 11 (1st Cir. 2019).

"The analysis is confined to the totality of the circumstances known to the officers at the time the decision to use force was made. The fact that force was used is not, in and of itself, dispositive." Farrah ex rel. Est. of Santana v. Gondella, 725 F. Supp. 2d 238, 245 (D. Mass. 2010). "The issue rather is whether the amount of force used was reasonable under the circumstances." Id. Reviewing courts "must make 'allowance' for the need of police officers 'to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Berube v. Conley, 506 F.3d 79, 83 (1st Cir. 2007) (quoting Graham, 490 U.S. at 396-97). Thus, reasonableness must be judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

### a.  Severity of the Crime

"When the subject of a seizure has not committed any crime, the first Graham factor ordinarily cuts in the subject's favor." Gray, 917 F.3d at 8-9. Here, officers were not called to the scene to respond to a reported crime. This was a medical emergency in which someone was having a psychotic break. As the BPD Policy and Procedure 1106 states, "Mental illness is not a crime and does not, by itself, justify or require police intervention." [Dkt. 59-3 at 37]. Accordingly, the first Graham factor cuts against Defendants.

### b.  Whether There Was an Immediate Threat

The second Graham factor asks courts to determine "whether the suspect pose[d] an immediate threat to the safety of officers or others." Graham, 490 U.S. at 396. Defendants make much of the fact that Anderson's 911 call was disconnected. According to Defendants, 911 calls often get disconnected during situations involving domestic violence. [Dkt. 67 at 3]. Thus, Anderson's hanging up quickly added a heightened layer of uncertainty and fear. [Dkt. 59 at 2].

However, Anderson's 911 call alone is not sufficient to create an "extra layer of urgency." [Dkt. 67 at 3]. Some 911 hang-up or disconnected calls are pranks, and some, such as here, reflect the caller's change of mind. [See Dkt. 59-8 at 35 (Anderson stating she hung up because she "didn't want to be involved.")]. This case is not like 911 hang-up call cases in which officers had an objectively reasonable basis to conclude there was an immediate need to protect others or themselves from serious harm, based on the totality of the circumstances. See, e.g., Johnson v. City of Memphis, 617 F.3d 864, 869 (6th Cir. 2010) (finding that "the combination of a 911 hang call, an unanswered return call, and an open door with no response from within the residence" justified officers' belief someone required immediate assistance when responding to a widow's emergency phone call that her husband was bipolar and off his medication); United States v. Snipe, 515 F.3d 947, 949 (9th Cir. 2008) (in which a 911 call with a "very hysterical sounding" caller "screamed . . . [g]et the cops here now" was evidence of an emergency); United States v. Najar, 451 F.3d 710, 720 (10th Cir. 2006) (finding that the nature of the 911 call, the officers' reasonable belief someone might be preventing communication with safety officials, the plaintiff's reluctance to answer the door, and his obfuscation regarding the occurrence of the 911 call demonstrated "reasonable grounds to believe someone . . . may have been in need of emergency aid and immediate action was required").

At no point did Anderson make any statement or suggestion to law enforcement that a physical altercation of any kind had occurred or that any emergency, injury, or threat of injury existed. Anderson did not deny making the 911 call and she was waiting for police to arrive when Roycroft approached her. During her call to 911, her voice was clear, she sounded calm, and there was no background noise to suggest there was a concerning event or crime occurring.

Besides the 911 call itself, Roycroft had no indicia of an urgent, ongoing emergency when he approached Miller.

If anything, Roycroft's heightened concern cuts against Defendants' arguments justifying his actions.  If he was afraid for his and Anderson's safety, he could have asked Anderson more questions and waited for backup.  The circumstances were not so exigent that Roycroft had to act immediately, rather than wait for Jackson to arrive and to develop a tactical plan together.  See Hopkins v. Bonvicino, 573 F.3d 752, 765 (9th Cir. 2009) ("'[I]f [police officers] otherwise lack reasonable grounds to believe there is an emergency,' they must 'take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place.'") (quoting United States v. Russell, 436 F.3d 1086, 1092 (9th Cir.2006)).

Defendants allege Roycroft did not know why Anderson's 911 call was disconnected, but he did know Miller was delusional, and that he understood Miller "might become violent if he knew Anderson called the police."  [Dkt. 60 at 8].  Given this context, Defendants argue, it was reasonable for Roycroft to believe "Anderson was at risk of serious bodily injury"—especially after Miller became angry when Roycroft told him that Anderson had called the police.  [Dkt. 60 at 19].  Although a jury could supportably find on those facts that Roycroft reasonably believed that Miller posed a danger to him and Anderson, a jury could find instead that Roycroft did not have a reasonable belief.  Miller was moving further into his own house to try to get away from Roycroft and did not appear to be posing a danger to anyone.  At the time Roycroft approached Miller, Miller was empty-handed, shirtless, and barefoot.  [Dkt. 59-10 at 8].

Roycroft made the decision to tell Miller that Anderson had called the police, which he knew could trigger and anger Miller—and it did.  This error set in motion a series of events that ended tragically.  A reasonable juror could find that Roycroft did not have enough information to

have a reasonable basis to assume Miller was going to be violent towards anyone because he was angry. When Roycroft spoke to Anderson, she said Miller was delusional. Even when she said that she was afraid Miller would become angry if he learned she had called the police, she did not say she thought he would respond violently. She also did not say Miller had been acting violently, had a history of violence, or that he had any suicidal ideations. As Plaintiff points out, not every person who is hallucinating or is mentally ill is likely to cause harm. [Dkt. 65 at 14]. Erratic or unpredictable behavior might require an officer to be alert and prepared for different possible scenarios but does not necessitate assuming the worst. Sometimes an individual's behavior is a manifestation of their mental health condition but is not dangerous. Under those circumstances, a fact finder could reasonably conclude that Roycroft's fear was not well-founded or reasonable.

A jury could also supportably find that at the time Roycroft had grabbed Miller's arm and Miller had pulled away, there was no need for Roycroft to put Miller in a seatbelt hold. Roycroft stated he was afraid Miller was looking for a weapon inside the house. [Dkt. 59-4 at 11]. While there might always be a general concern that common household items such as kitchen knives or scissors could be weaponized, Miller never made any threats to anyone. Roycroft's belief that he needed to stop Miller's movements because there might be weapons inside the home Miller might use was purely speculative.

The last stage of the altercation occurred when Miller and Roycroft fell into the office area and Miller lay uncuffed on the ground. Roycroft argues that restraining Miller was necessary because he perceived Miller was moving to reach the golf clubs. [Dkt. 59 at ¶ 87]. Although Roycroft's left arm being trapped underneath Miller may have been a cause for concern, the facts do not suggest Roycroft was in danger. At that point there was no objective

evidence that Miller had an object in his hand or that he was armed with a weapon.  Jackson later confirmed Miller was empty-handed.  [Dkt. 59 at ¶ 121].  In addition, Miller was on the floor face down and his ability to move was restricted by the small office space they were in and the fact that his arms were underneath his body.  The police procedures and use of force expert Plaintiff retained, Scott Defoe ("DeFoe"), went so far as to state, "all of this stuff about [Miller] being able to grab a golf club and swing it in this position is—I don't want to use the word nonsensical, but [is] impractical or improbabl[e] or impossible to actually be able to do from that position."  [Dkt. 59-18 at 7].

Viewing facts in the light most favorable to Plaintiff, Miller's actions suggest he was trying to get away from Roycroft and not that he was trying to grab a weapon or harm anyone.  At no point did Miller have a weapon, nor did he ever indicate he wanted one.  He never threatened the Defendants or Anderson, and he never struck anyone.  Indeed, a reasonable jury could find that the facts merely conform with Miller's unequivocal statement when he was on the deck that he simply did not wish to interact with Roycroft.

### c.  Whether Miller Was Actively Resisting or Attempting to Evade Arrest

The final Graham factor—whether Plaintiff was actively resisting arrest—also points in Miller's favor.  Defendants allege that Miller actively fought with Roycroft while he was in a seatbelt hold, and subsequently tried to resist being handcuffed by keeping Roycroft's left arm pinned against his body.  [Dkt. 59 at ¶ 101].  Defendants also argue that Miller resisted by kicking and trying to keep his arms underneath his body.  [Id. at ¶¶ 103, 111].

But the Court must view the evidence in the light most favorable to Miller and draw all reasonable inferences in his favor.  There are not sufficient facts to impute intent or infer Miller was deliberately trapping Roycroft's arm underneath his body.  The record here supports the

inference that Miller struggled to cast Roycroft's weight from his back so he could breathe. The testimony of DeFoe, the police procedures and use of force expert, further bolsters this. He explained that when a person falls, they put their arms out to brace their fall, which subsequently puts their arms underneath their body, restricting their arm movement. [Dkt. 66-1 at 18-19]. Based on Miller's chest being pressed to the ground and Roycroft's body weight on his back, DeFoe believed Miller would not have been able to free his arms in that moment even if he had wanted to. [Id.]. It was DeFoe's conclusion that Miller's resistance was predicated on his attempting to breathe rather than his resisting Defendants' attempts to handcuff him. Thus, there is a genuine issue of material fact as to whether Miller actively resisted at all.

The risk of restraint-related asphyxiation in this circumstance should have been familiar to both Defendants. Roycroft took an 8-hour course that provided training to help people experiencing mental health problems, such as psychosis. [Dkt. 66-14 at 1]. Jackson received training from the SWAT team he belonged to, in which he learned that "as soon as reasonably possible," an individual should be put in a recovery position "so they can breathe" and that weight should not be put on the person's back. [Dkt. 59-11 at 15-16]. Moreover, Jackson knew that obesity, age, and physical condition were factors that could make it more difficult for a person to breathe if they were left lying on their stomach. [Dkt. 64 at 42]. Plaintiff also entered into the record a guidance circulated by the Department of Justice in 1995 titled, "Positional Asphyxia—Sudden Death" [Dkt. 66-12 at 1], warning of the risk of positional asphyxia resulting from the use of a prone restraint. In particular, the guidance notes that obesity is one of the factors that makes "some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position." [Id. at 2]. Thus, a jury could find

that an objectively reasonable officer with Defendants' training would have concluded that Miller was struggling to breathe, not resisting arrest.

It is undoubtedly true that police officers must often make split-second decisions and therefore "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment," Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  It is equally true that even where some force is justified, the amount actually used may be excessive.  Here, applying the Graham analysis, a jury could reasonably conclude that there was little or no need for the application of force against Miller, and that in light of his death, the force used was excessive.

### 2.  Clearly Established Right

The Court now turns to the clearly established prong of qualified immunity.  The second prong of the analysis is further broken down into two elements.  The Court must first assess "whether the contours of the right, in general, were sufficiently clear," and second "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right."  Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014); see also Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014) ("A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.").

Although the contours of a right must be "sufficiently clear," Anderson v. Creighton, 483 U.S. 635, 640 (1987), there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).  Here, there are four instances in which Defendants used force against Miller: 1) when Roycroft grabbed Miller by the arm; 2)

when Roycroft put Miller in a seatbelt hold; 3) when Jackson punched Miller twice in the side; and 4) when Roycroft and Jackson restrained Miller when he was already on the floor and handcuffed him.

Regarding the first three uses of force, for the reasons discussed above, a reasonable jury could find that no use of force was necessary. A reasonable jury could alternatively find that some amount of physical force was warranted. Regardless, there is no Supreme Court case or robust consensus of persuasive authority to demonstrate that these instances were a violation of a clearly established right and that a reasonable officer would have known this. However, that is not the case for Defendants' last use of force when Miller was already on the floor.

When Roycroft and Miller tripped and fell to the floor in the office space area, Roycroft fell to Miller's left side. [Dkt. 59 at ¶¶ 92, 94]. Roycroft was "more on his left hip," with his right leg over Miller's left leg, his right arm draped between Miller's shoulders, and his left arm trapped underneath Miller. [Id. at ¶ 104]. In April 2019, Roycroft weighed 190 lbs. [Dkt. 59-4 at 12], and Miller weighed 214 lbs. [Dkt. 66-3 at 5]. Plaintiff's use of force expert DeFoe estimates Roycroft weighed 215 or 220 lbs. while wearing all of his police gear. [Dkt. 66-1 at 20]. A reasonable jury could infer that approximately half of Roycroft's weight was on Miller's back while he was restrained on the floor and that Roycroft used his right arm to apply pressure on Miller's back. [Dkts. 59-4 at 35; 64 at ¶ 207]. Miller tried to push up to breathe by bringing his chest up. [Id.]. Roycroft reacted to Miller pushing up by applying pressure on Miller's back between his shoulder blades. [Id.]. In other words, when Miller pushed up, Roycroft pushed down. [Dkt. 59-4 at 35]. While the officers attempted to handcuff Miller, Anderson remembers him saying, "I can't breathe." [Dkt. 64 at ¶ 211]. Anderson remembers seeing one of the officers placing his knee on Miller's back to create a leverage point for getting the handcuffs on

Miller.  [Dkt. 59 at ¶ 144].  Anderson asked, "Can he breathe?" and Roycroft or Jackson responded, "Yes, he can breathe."  [Dkt. 64 at ¶ 126].  Then Miller said, "Amy, help me."  [Dkt. 64 at ¶ 213].  Anderson believes those were probably Miller's last words.  [Dkt. 59-8 at 57].

The First Circuit has found that exerting a lot of sustained pressure on the back of a restrained person is unreasonable.  In McCue v. City of Bangor, Maine, the court noted that "it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."  838 F.3d 55, 64 (1st Cir. 2016).  Four other circuits have reached the same conclusion.  See Weigel v. Broad, 544 F.3d 1143, 1152, 1155 (10th Cir. 2008) (holding officer not entitled to qualified immunity at summary judgment stage where he applied pressure to detainee's back for "about three minutes" after hands and feet had been restrained); Abdullahi v. City of Madison, 423 F.3d 763, 765, 771 (7th Cir. 2005) (holding officer not entitled to qualified immunity at summary judgment where an officer "placed his right knee and shin on the back of [plaintiff's] shoulder area and applied his weight to keep Abdullahi from squirming or flailing" for 30 to 45 seconds, despite the fact that the detainee had "arch[ed] his back upwards as if he were trying to escape" in "a futile attempt to breathe"); Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir. 2003) (holding officers violated the plaintiff's Fourth Amendment right to be free from excessive force by pressing their weight against his torso and neck "after he was 'knock[ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach'").  Accordingly, this Court finds that it was clearly established that Plaintiff had a constitutional right to be free from an officer kneeling on his back after he had been restrained.

The second element of the clearly established prong requires the Court to determine "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." Ford, 768 F.3d at 23. Similar to Lachance v. Town of Charlton, there is a dispute of fact whether either Defendant placed his knee on Miller's back and whether they exerted any weight on Miller's back. 368 F. Supp. 3d 231, 241 (D. Mass. 2019) aff'd, 990 F.3d 14 (1st Cir. 2021) (finding that officers, when responding to a medical emergency, used excessive force when an officer placed a knee in the center of the plaintiff's back and handcuffed him).[1] Parties also dispute whether Miller said he could not breathe or made a plea for Anderson's help. Nonetheless, as the Court has stated before, at the summary judgment stage, "disputes must be resolved, and inferences must be drawn, in Plaintiff's favor." Id. Miller's account of the facts leaves us with a scenario in which an officer deployed aggressive restraint tactics against a civilian, without any provocation beyond using profanity to abruptly end a conversation with the officer and walking away into his own home.

The Court recognizes that police officers are often called upon to place themselves in harm's way to serve and protect the public and are required to make split-second decisions regarding whether to use force. Nevertheless, the Constitution requires that when officers use force, they use no more force than necessary, as it holds them "accountable when they exercise power irresponsibly." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Consequently, for purposes of this motion, the Court finds that a reasonable officer would have been aware that subduing an unarmed and mentally unstable individual with compressive body weight who stated

---

[1] There is a genuine issue of material fact as to whether Roycroft and Miller gave false statements to the lead paramedic, Vicki Yefko ("Yefko"), as to what occurred between Defendants and Miller or whether Yefko obtained that incorrect information from someone else at the scene. [See Dkts. 65 at 13-14; 67 at 4]. Setting aside whether Miller and Roycroft spoke to Yefko, their subjective motivations "ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." Graham, 490 U.S. at 397.

he could not breathe would violate that person's clearly established right to be free from excessive force.  Thus, Roycroft is not entitled to qualified immunity.


### 3.  Failure to Intervene

"An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers."  Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002). To establish an officer's liability for failing to intervene, a plaintiff must show that the officer: (1) "was present when excessive force was used;" (2) "observed the use of excessive force;" (3) "was in a position where he . . . could realistically prevent that force;" and (4) "had sufficient time to do so."  Davis v. Rennie, 264 F. 3d 86, 102 (1st Cir. 2001).  Plaintiff claims that Jackson is liable for failing to intervene when Roycroft used unreasonable force on Miller.  [Dkt. 65 at 19-20].  Defendants argue, however, that Jackson is entitled to qualified immunity.  [Dkt. 60 at 17-20].

Qualified immunity is ordinarily a question of law for the Court.  And although the Supreme Court has urged lower courts to determine the applicability of qualified immunity as soon as practicable, Anderson, 483 U.S. at 646 n.6, it is sometimes impossible to resolve the qualified immunity question before trial.  See Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002) (explaining that disputes as to material facts sometimes will preclude summary judgment based on qualified immunity).  This is one such case.  The factual disputes surrounding the circumstances of Miller's restraint and handcuffing precludes determining whether qualified immunity applies to Jackson for failure to intervene.

By the time Jackson arrived at the office area inside the home, Roycroft and Miller had already tripped and fallen. Jackson knew from the 911 dispatch call that this was a mental health call. Jackson observed Miller and Roycroft on the floor with Roycroft's left arm stuck between Miller's torso and left arm. Roycroft subsequently told Jackson something along the lines of, "I don't know if he has anything in his hands," or "I think [Miller]'s got something in his hands." [Dkt. 59-4 at 34]. Because Miller's arms were underneath his body, Jackson could not see Miller's hands, but he could see the shaft of a single golf club under Miller's body. [Dkt. 59-12 at 12]. Given the paucity of information Jackson had in that moment, an objectively reasonable police officer standing in Jackson's shoes would have contemplated the possibility Miller might be dangerous and would have prioritized helping Roycroft. Jackson was thus reasonable in asking whether it would be appropriate for him to use his taser. When Roycroft told him not to, it was reasonable for Jackson to then punch Miller's torso in an attempt to free Roycroft's left arm and handcuff Miller. [See Dkt. 66-1 at 22 (Plaintiff's expert Defoe acknowledges that, based on what Jackson knew at the time, it was reasonable for him to suggest using a taser and subsequently use "distraction strikes to effect the handcuffing technique")]. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'" City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 612 (2015) (quoting Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298–29 (1967). "This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" Id. (quoting Heien v. North Carolina, 574 U.S. 54, 61 (2014)).

There are, however, factual disputes regarding events immediately after that the jury must decide. There is a genuine dispute how long Miller was on the floor. Jackson estimates that

approximately sixty seconds transpired between the time he arrived, and the moment Miller was handcuffed.  [Ex. 59-12 at 19].  Based on the time Roycroft heard the sliding door fall out of its frame and the time the EMTs were called, use of force expert Defoe theorizes Roycroft applied pressure on Miller's back while attempting to handcuff him for approximately two minutes and fifteen or thirty seconds.  [Dkt. 66-1 at 22].  This means Jackson had approximately the same amount of time to determine whether his and Roycroft's use of force was excessive and that they needed to stop.  There is also a dispute about whether one of the officers put his knee on Plaintiff's back and if so, for how long and how much pressure was exerted.  Anderson remembers one of the officers placing his knee on Miller's back, but Roycroft stated he does not remember placing his knee or observing Jackson place his knee on Miller's back at any point.[2] Defendants also allege they did not hear or observe Miller struggling to breathe or notice anything about Miller's behavior that suggested he was experiencing a medical event. According to Defendants, neither officer heard Anderson nor Miller speak.  In contrast, Anderson remembers Miller saying, "I can't breathe," and "Help me, Amy."[3]  Anderson stated she then asked one of the officers whether Miller could breathe and one of them replied that he could.

   Jackson would be entitled to qualified immunity if his version of events is substantiated. On the other hand, Miller would prevail on Jackson's qualified immunity claim if the fact finder believes Miller's version of events and it is established that Jackson had an opportunity and sufficient time to stop Roycroft from exerting excessive force on Miller.

---

[2] In his affidavit, however, Roycroft acknowledges "it is possible" that one of the Defendants placed his knee on Miller's back for a "few seconds" while they brought Miller's arms together to handcuff him.  [Dkt. 59-5 at 14].
[3] During her deposition, Anderson was unequivocal about this and insisted this was "not like a falsified retrieved memory or anything."  [Dkt. 59-8 at 60-61].

Because of these factual disputes that the jury must decide, it is unclear whether Jackson had a duty to intervene.  Thus, the Court will wait until after the facts have been settled to determine whether Jackson's conduct "was objectively reasonable and falls under the qualified immunity umbrella." Kelley, 288 F.3d at 7.

### B.      Wrongful Death, M.G.L. ch. 229 § 2

Count II alleges wrongful death under Mass. Gen. Laws ch. 229 § 2 on the basis that Defendants' use of force caused Miller's death.  [Dkt. 1 at 8].  "To prevail on a wrongful death claim, pursuant to G.L. ch. 229, § 2, a plaintiff must prove negligence, or willful or reckless conduct, on the part of the defendant, that caused the death of a person." Gianocostas v. Interface Grp.-Mass., Inc., 450 Mass. 715, 727 n.13 (2008).  "Much like a § 1983 claim, the Massachusetts Wrongful Death Act 'largely incorporates common law tort principles,' such as factual and legal causation." Geigel v. Bos. Police Dep't, No. 22-CV-11437-DJC, 2024 WL 68387, at *5 (D. Mass. Jan. 5, 2024) (quoting Davis v. United States, 670 F.3d 48, 53 (1st Cir. 2012)).

For the reasons explained above with respect to the § 1983 claim—namely that there are disputed material factual issues whether Roycroft and Jackson used excessive force and violated the Plaintiff's constitutional rights—Defendants' Motion for Summary Judgment as to Miller's wrongful death claim is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Dkt. 57] is **DENIED**.

**SO ORDERED**.

Dated: March 31, 2024

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge